# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA and )
THE STATE OF ILLINOIS, *ex rel* )
LAURIE GESCHREY and LAURE )
JANUS, )
                               )      Judge Joan B. Gottschall
            Plaintiffs-Relators, )
                               )      Case No. 10 C 2413
               v. )
                               )
GENERATIONS HEALTHCARE, LLC, )
ODYSSEY HEALTHCARE, INC., )
NARAYAN PONAKALA, CATHERINE )
PONAKALA, and JOHN DOES, )
                               )
                Defendants. )

## MEMORANDUM OPINION & ORDER

Plaintiffs-Relators Laurie Geschrey and Laure Janus ("Relators") are former employees of hospice-care company Generations HealthCare, LLC ("Generations"), which was purchased by Odyssey HealthCare, Inc. ("Odyssey") after Relators' employment was terminated. Relators brought an action against Generations, Odyssey, and Generations's founders Catherine and Narayan Ponakala, alleging fraud against the United States and the State of Illinois and retaliation against employees, under the federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/3, and the Illinois Whistleblower Reward and Protection Act ("IWRPA"), 740 Ill. Comp. Stat. 174/30. The United States has declined to intervene in the action. Now before the court are Generations's and Odyssey's motions to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). The court

denies Generations's and Odyssey's motions as to Counts I-III of the Complaint and dismisses Count IV without prejudice. The court also dismisses Relators' claims against Narayan Ponakala without prejudice.

## I. BACKGROUND

Viewing the facts in the light most favorable to Relators, as the court must on a motion to dismiss, the background of this case is as follows. Generations, located in Westchester, Illinois, is a hospice company that provides palliative care to terminally ill patients. During the time period at issue, most of its patients were Medicare and/or Medicaid recipients; it had very few patients with private insurance. Generations submitted bills to Medicare twice a month through an electronic billing system.

Janus was employed by Generations as a bereavement and spiritual-care coordinator and chaplain from 2002 until August 2008, when she was terminated for allegedly pretextual reasons after raising concerns about the company's practices. Geschrey, a chaplain and Psych-Social Field Supervisor, was terminated in 2007 for allegedly pretextual reasons after she refused to go along with Generations's practices. Both Relators went to work for Odyssey before it purchased Generations on or about December 31, 2009, and Janus still works for Odyssey. Odyssey hired all of Generations's employees and put Generations's patients onto its own patient roster.

### A.  Medicare and Medicaid Regulations Governing Hospice-Care Benefits[1]

The Department of Health and Human Services reimburses hospice providers for services provided to eligible beneficiaries on a *per diem* basis. Patients are eligible for

---

[1]    Regulations governing patient certification for hospice benefits were revised several times during the period Relators worked for Generations, and the regulations have since been revised again. The court relies on language common to the different versions of the regulations. For the purposes of this case, Generations need not have conformed to all of the requirements governing the hospice-certification process that are found in the current hospice-care regulations, enacted in 2011. *See* 42 C.F.R. § 418.22 (2011).

hospice care if they have a terminal diagnosis and a life expectancy of six months or less and if they have elected to forego further curative treatment. According to Medicare regulation 42 C.F.R. § 418.20, in order "to elect hospice care under Medicare, an individual must be—(a) entitled to Part A of Medicare; and (b) certified as being terminally ill in accordance with § 418.22." The latter section provides that "[t]he certification must specify that the individual's prognosis is for a life expectancy of 6 months or less if the terminal illness runs its normal course." § 418.22(b). The certification statements must be obtained from the hospice's medical director or physician and the individual's attending physician if the individual has one. § 418.22(c). The written certifications must be filed in the patient's medical record. § 418.22(d)(2).

According to the version of the regulations in effect since 2006, "[a]n individual may elect to receive hospice care during . . . (1) An initial 90-day period; (2) A subsequent 90-day period; or (3) An unlimited number of subsequent 60-day periods." § 418.21 (2006).[2] "The hospice must obtain written certification of terminal illness for each of the periods listed in § 418.21, even if a single election continues in effect for an unlimited number of periods." § 418.22(a)(1). The written certification is a prerequisite for payment. § 418.22(a).

Hospice-eligible individuals must also file a statement with the hospice-care provider electing hospice care. § 418.24. The statement includes the provisions that "the individual has been given a full understanding of the palliative rather than curative nature of hospice care," and that payment for Medicare services related to the treatment of the

---

[2] The previous version of the regulations divided the periods into two 90-day periods, followed by a 30-day period, followed by a period of unlimited duration. § 418.21(a) (1993).

terminal condition is waived by hospice election. § 418.24(b)(2), (d)(2). The hospice then files a notice of election with Medicare to begin the *per diem* payments.

Hospice providers must make services, including nursing services, available on a 24-hour basis. The rate of reimbursement by the government varies depending on the type of care provided: (1) routine (non-continuous) home care, (2) continuous home care "consisting predominantly of nursing case on a continuous basis at home . . . during brief periods of crisis," (3) short-term "inpatient respite care" in an approved facility, and (4) general inpatient care in a facility "for pain control or acute or chronic symptom management." § 418.302(b), (c). Regarding (2) continuous home care, the regulations explain that "[e]ither homemaker or home health aide (also known as hospice aide) services or both may be covered on a 24-hour continuous basis during periods of crisis but care during these periods must be predominantly nursing care." § 418.204(a). On any day that the patient is not receiving inpatient or continuous care, the hospice is paid the routine home care rate. The *per diem* rate for routine care (approximately $150 in Cook County) is paid regardless of the actual services provided on a given day. § 418.302(e).

The State of Illinois also covers hospice services for Medicaid recipients. To be eligible for reimbursement, the services must comply with the federal Medicare regulations in 42 U.S.C. §§ 418.1-418.405. *See* Handbook for Hospice Agencies, www.hfs.illinois.gov/handbooks/chapter200.html (last visited August 13, 2012). The certification requirements and categories of care are identical to those set out in the Medicare regulations. *Id.*

**B. Relators' Allegations of Fraudulent Billing**

    1. <u>Improper Enrollment and Fraudulent Certifications</u>

Relators claim that Generations recruited and certified patients that it knew were ineligible for hospice care because they were not terminally ill. It then fraudulently billed Medicare and/or Medicaid for the patients' care on a *per diem* basis.[3] Relators claim that patients were recruited from Chicago housing projects by Generations's sales staff, and that the staff, who offered housing-project residents free medical supplies and other perks, often failed to explain that signing up for hospice made patients ineligible for curative treatments. The sales staff obtained signed election forms prior to medical staff's evaluation of the patients. Relators claim that they were involved in the decisions to certify patients for hospice care because they were part of an "interdisciplinary team" assigned to each patient. A nurse and members of the interdisciplinary team would visit the patient, evaluate the patient's condition, and meet to report their findings. Based on the interdisciplinary team's findings, a written certification of eligibility for hospice care was prepared and the notice of hospice election was filed on the patient's behalf. Generations's medical director would sign off on the written certification without having seen the patient.

Relators allege generally that this procedure for certifying patients was improper because the medical director was not using his clinical judgment to assess whether the patient was terminally ill, as required by the hospice-benefit regulations. Relators further claim that, when patients were re-certified, nurses did not actually visit the patients but relied on vital signs taken by nursing assistants.

---

[3]    Relators repeatedly use "and/or" in their allegations, indicating that they are not sure which government program was billed for a particular patient's care.

Relators also provide specific examples of allegedly improper certifications. First, they allege that patient "G.S." was obese but not terminally ill and remained in Generations's care "for years." She was discharged before she died. (Compl. ¶ 38.) Patient "A.W.," a Medicare recipient with Alzheimer's, was certified as terminally ill, despite the fact that Janus, a social worker, and a nurse who visited the patient did not believe she was an appropriate candidate for hospice because she could talk, eat, and walk, which Relators allege were criteria for determining hospice eligibility for an Alzheimer's patient. (*Id*. ¶ 42.) The staff who visited A.W. reported their opinions to Ms. Wickman, a nurse, and Mrs. Ponakala, but A.W. was certified as hospice-appropriate, and the government was billed for her care.

Geschrey and a social worker agreed that another unnamed patient was not an appropriate candidate for hospice. Although diagnosed with dementia, she could walk, talk, and eat. Nonetheless, the patient, who spoke Italian, was certified for hospice after Ms. Wickman told Geschrey to write "speech unintelligible to writer" in her notes, leaving out the fact that the woman's speech was unintelligible only to those who did not speak Italian. (*Id*. ¶ 43.) Generations billed the government for the woman's care.

2. Submission of False Documents

Relators further allege that Generations submitted false documents to Medicare and Medicaid in support of its claims for reimbursement. Documents submitted to the government included written certifications, election notices, bills, and patient care plans. The billing department was run by Ms. Alina Sanchez, who set up electronic billing systems with Medicare and Medicaid and submitted documents to Medicare when Medicare requested patient documentation.

Relators allege generally that Defendants regularly required nurses to change their notes when they did not support bills submitted to Medicare and Medicaid. When Medicare made a request for documents to audit claims, Relators claim that Ms. Wickman and Mrs. Ponakala required nurses to change notes that did not support the billings before giving the documentation to Ms. Sanchez, who then submitted it to Medicare.

Relators further allege that Generations billed the government for patients who were not receiving services. On one occasion, patient "J.C." was out of the state on the date of a nursing assistant's visit, and therefore ineligible for hospice care on that date. The nursing assistant's notes indicated as much. Relators claim that Mrs. Ponakala required the nursing assistant to alter her notes to indicate that J.C. had "refused services" on the date of the visit. Relators allege that Generations submitted bills to Medicare or Medicaid for J.C.'s care. (Compl. ¶ 50.)

3. Fraudulent Billing for Services not Provided

Relators also claim that Generations failed to provide patients with needed services that Generations was required to provide. As an example, they cite the case of patient "E.P.," who was kept on the hospice census for approximately five years before she was discharged. After the discharge, E.P.'s daughter called Generations to request hospice services. Relators allege that an inexperienced nurse diagnosed E.P. with a urinary tract infection and did not readmit her into hospice care. E.P. died hours later. (*Id*. at ¶ 52.)

Relators allege that on another occasion, in 2004, Janus was sent to a patient's home to provide "homemaker" services as a chaplain. Generations billed the government

for "continuous home care," which under the Medicare regulations must be predominantly nursing care. No nurse was present, however. Janus repeatedly called to request a nurse, saying that the man needed sedation or pain medication. A nurse arrived and left after giving the man medication, although Janus was not qualified to administer additional medication. Geschrey was sent to the patient's home to relieve Janus, and her time was also billed as "continuous home care," although again no nurse was present. The patient died within an hour of Geschrey's arrival. (*Id.* at ¶ 54.)

4. Retaliation

Relators claim that they were fired because they raised concerns to Mrs. Ponakala and Ms. Wickman about Generations's fraudulent practices, including the fact that patients were being improperly certified as terminally ill. Geschrey claims that Generations falsely told other employees that Geschrey had falsified time sheets, and that the Ponakalas sent Geschrey a letter warning her not to speak about what had happened. (*Id.* ¶ 55.) Relators attach to the Complaint a letter from Generations's legal counsel demanding that Geschrey cease and desist from any contact with Generations's clients or employees. (*Id.* Ex. C (Letter), ECF No. 1.) Janus claims that she was fired suddenly for "issues with her documentation," despite spotless personnel records and annual reviews. (*Id.* ¶ 55.) Relators allege that a social worker, Lisa Raubolt, was fired the week before Janus was fired, after raising concerns about A.W.'s enrollment in hospice care. Another nurse was fired after refusing to change her notes when requested to do so. (*Id.* ¶56.)

## II. Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint's allegations "must plausibly suggest that the plaintiff has a right to

relief, raising that possibility above a 'speculative level.'" *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 569 n.14 (2007)). Legal conclusions or conclusory allegations that simply recite the elements of a claim are not sufficient to withstand Rule 12(b)(6) scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Additionally, as the FCA "is an anti-fraud statute," FCA claims "are subject to the heightened pleading requirements of [Federal Rule of Civil Procedure] 9(b)." *United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005). To satisfy Rule 9(b), a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." This is often described as requiring a plaintiff to plead "the who, what, when, where and how" of the alleged fraud. *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). For purposes of a motion to dismiss for failure to comply with Rule 9(b), the court takes the allegations in the complaint as true and makes all reasonable inferences in the plaintiffs' favor. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

### III. ANALYSIS

Relators' Complaint alleges four counts. Count I alleges a violation of 31 U.S.C. § 3729(a), based on the presentation of false or fraudulent claims to the federal government. Count II claims a violation of 31 U.S.C. § 3730, which bars retaliatory actions against a person based on their actions "in furtherance of" an FCA claim. Count III claims a violation of the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/3(a). Count IV alleges a violation of the IWRPA, 740 Ill. Comp. Stat. 174/30.

**A. Federal and State Fraud Claims (Counts I & III)[4]**

1. Rule 9(b)'s Particularity Requirement

The False Claims Act makes it unlawful to knowingly (1) "present or cause to be presented to the United States a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1) (2006); [or] (2) make or use a false record or statement material to a false or fraudulent claim, § 3729(a)(1)(B)." *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 (7th Cir. 2011) (explaining that the 2009 amendment to § 3729(a)(1)(B) including the "material to" language applies to cases pending on or after June 7, 2008). In a case in which false claims are allegedly presented to the government over many years, a relator is required to plead only representative examples of the alleged violations. *United States ex rel. Obert-Hong v. Advocate Health Care*, No. 99 C 5806, 2001 WL 303692, at *3 (N.D. Ill. Mar. 28, 2001); *see also United States v. Quad City Prosthetic, Inc.*, No. 06 C 4015, 2011 WL 3273142, at *5 (C.D. Ill. Aug. 1, 2011) (motion to dismiss FCA suit denied because plaintiffs provided examples of claims submitted to Medicare and Medicaid, including time, location, persons responsible, and alleged falsity).

Relators allege that Generations committed three types of fraud against the government: improper enrollment and fraudulent certifications, submission of false documents, and improper billing for services not provided. As to the false certification claim, Defendants argue that Relators plead insufficient facts to support that patients were improperly certified for hospice care. They claim that Relators' personal

---

[4] Defendants' arguments for dismissal of the federal and state-law fraud claims are identical. In this section, the court will address the FCA claim, but its reasoning applies equally to the Illinois False Claims Act, as Illinois courts interpreting the state act look to interpretations of the similarly worded federal FCA. *See, e.g.*, *People ex rel. Levenstein v. Salafsky*, 338 N.E.2d 844, 850-51 (Ill. App. 2003).

knowledge of the alleged fraud based on their participation in an interdisciplinary team amounts only to their disagreement with the conclusion that the patients were hospice appropriate. They further argue that Relators fail to identify the certifying physicians who ultimately made the certification decision. Therefore, Defendants contend, the Relators have not satisfied the requirements of Rule 9(b) that allegations of fraud be pleaded with particularity.

To the extent that Relators' allegations of fraud rest on the general charge that patients were certified as terminally ill without being seen by a physician, they are groundless. The fact that the medical director did not personally see the patients cannot form the basis for a claim of fraud, because this was not required by the hospice-benefit regulations. Section 418.22(b)(3)(iii) requires that the certifying physician "confirm[] that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient." It does not require a face-to-face examination.[5] Furthermore, Relators do not allege with particularity that the certifying physician did not use his clinical judgment in certifying patients for hospice, or identify specific certifications not based on a physician's clinical judgment.

Turning to Relators' allegations regarding individual patients, the court finds that the alleged fraud involving G.S. is not pled with sufficient particularity to satisfy Rule 9(b). Relators do not allege who was responsible for G.S.'s certification as terminally ill or why Relators believed the certification was fraudulent, rather than merely contrary to Relators' opinion that G.S. was ineligible for hospice. (*See* Compl. ¶ 38.) Nor are

---

[5]     The revised version of 42 C.F.R. § 418.22(a)(4) requires that "[a]s of January 1, 2011, a hospice physician or hospice nurse practitioner must have a face-to-face encounter with each hospice patient whose total stay across all hospices is anticipated to reach the 3rd benefit period." By implication, no face-to-face encounter was required during the period covered by the Complaint.

Relators' allegations regarding A.W. sufficient to state a claim of fraud. They allege the date when A.W. was enrolled in Generations's care, the names of those responsible for the allegedly fraudulent certification, and state the basis for Relators' belief that A.W. was not terminally ill. (Compl. ¶ 42.) But the fact that Relator Janus, a social worker, and a nurse agreed that the patient was not appropriate for hospice because she could walk, eat, and talk does not suffice to allege that the doctor's certification that A.W. was appropriate for hospice was fraudulent; it merely alleges that Relator Janus and others disagreed with the doctor's assessment. Relators have not alleged facts demonstrating that the certifying physician did not or could not have believed, based on his or her clinical judgment, that the patient was eligible for hospice care.

The court finds that Relators' allegations regarding the unnamed Italian woman, however, do allege a claim of fraud with particularity. According to the Complaint, Ms. Wickman told Relator Geschrey to write down "speech unintelligible to writer" in her notes in order to falsely imply that the Italian woman was non-communicative, rather than merely a non-English-speaker. (Compl. ¶ 43.) That misrepresentation was material to the government's payment of claims submitted for the patient. Relators do not claim a mere difference of opinion, but point to an attempt, personally witnessed by Geschrey, to falsify the notes on which the patient's certification of eligibility for hospice benefits was based. Thus, when the patient was certified for hospice eligibility, the physician could not have done so based on his clinical judgment; that judgment was based on false information. The court concludes that Relators have alleged "a false record or statement material to a false or fraudulent claim," as required by § 3729(a)(1)(B).

As to the claim regarding submission of false documents, Defendants argue that Relators do not provide any specific details of the alleged fraud—they claim only generally that nurses were required to change their notes before documentation was submitted to the government. The court finds that Relators have alleged at least one example of false documents material to a claim for payment that were submitted to the government. Relators allege that although patient J.C. was out of the state, a nursing assistant was required by Mrs. Ponakala to alter her notes to indicate that he had refused treatment, thus allowing Generations to bill the government the *per diem* routine-care rate for his care. (Compl. ¶ 50.) This allegation states a specific misrepresentation material to the government's payment of claims submitted for payment for services provided to J.C.

Finally, as to the alleged fraudulent billing of services not provided, Defendants argue that Relators allege no factual support for their claim that the government was billed for any services not rendered. In the case of E.P., the court agrees that Relators have not alleged that bills were actually submitted to the government; E.P. was not certified for hospice care at the time Generations allegedly failed to provide services to her. As to Generations's alleged failure to provide nursing care while billing for "continuous care," however, the court finds that Relators have sufficiently alleged an example of billing for services not provided. According to the Complaint, Janus and Geschrey were dispatched to the home of an actively dying man for nine hours to provide nursing services that they were not qualified to perform. Generations allegedly billed the government for these services at the "continuous care" rate, even though no nurse was present during Geschrey's shift, and a nurse made only a brief appearance during Janus's shift. (Compl. ¶¶ 53-54.) As continuous care must be "predominantly nursing care,"

§ 418.302, billing for the services at the continuous-care rate constituted a misrepresentation material to the claims submitted for payment. Relators' allegations support the conclusion that claims submitted for reimbursement at that rate were fraudulent because the services provided to the patient did not support such billing.

    2. <u>Nexus between Allegations and a Claim for Payment</u>

Defendants argue that even if the Relators have alleged the details of a scheme to present fraudulent bills to the government, they have failed to allege with the required particularity that Generations actually *submitted* claims to the government. Defendants are correct that "[t]he False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002) (citing cases from the First, Fourth, Fifth, and Eighth Circuits). "Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999)).

Defendants argue that Relators have not specified the actual submission of claims to the government, but have instead alleged in conclusory fashion that Generations billed Medicare and/or Medicaid for patients' care. The court notes that in so arguing, Defendants cite no cases from the Seventh Circuit. In this circuit, a relator does not need to have actually witnessed the "specific request for payment" or to have had access to paperwork submitted to the government. One of the most recent cases from the Seventh

Circuit on this issue is *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009). In *Lusby*, the Seventh Circuit explained that it is not "essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit. True, it is essential to show a false statement. But much knowledge is inferential." *Id*. at 854. The Seventh Circuit deemed it a plausible inference that a fraudulent claim was submitted to the government where the firm's contract with the government required it to submit a particular form. The Seventh Circuit concluded that if the defendant "submitted [the form], knowing the representations to be false, then it committed fraud." *Id.* The court added that, although it was possible that payments were made without the submission of the fraudulent documentation, the possibility was slim, and "a pleading [need not] exclude all possibility of honesty in order to give the particulars of fraud. It is enough to show, in detail, the nature of the charge, so that vague and unsubstantiated accusations of fraud do not lead to costly discovery and public obloquy." *Id*. at 854-55.

Despite Relators' lack of specific knowledge about billings submitted to the government, the fact that most of Generations's patients were receiving government benefits and Generations billed Medicare and Medicaid at a *per diem* rate for each covered patient creates a strong inference that bills for the care of patients as to whom fraud has been alleged were submitted to the government. The Complaint alleges that "Generations has mostly Medicare/Medicaid patients because its main service area includes the underserved people on the south side of Chicago. It does have some patients with private insurance, but very few." (Compl. ¶ 7.) Relators do not specify in each example whether Generations billed Medicaid, Medicare, or both. Even so, the facts as pleaded support the inference that claims based on fraudulent misrepresentations were

submitted to one or both of the government programs.   Although there is a slim possibility that the alleged fraud might have been committed only in connection with Generations's "very few" patients with private insurance, at the pleading stage, Relators need not exclude all possibility of honesty.

In addition, the court considers Relators' positions at Generations when assessing what information is required of them.   The Seventh Circuit has recently noted the importance of balancing detail with flexibility in applying the Rule 9(b) standard, criticizing courts and litigants that cling too tightly to the incantation of "who, what, when, where, and how," rather than understanding that the information required of a plaintiff will differ in each case.   *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (citing *Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998) (allowing greater flexibility when information lies outside of plaintiff's control)).   As Relators' duties primarily involved providing spiritual care and supervising other spiritual care or field care employees, they had no access to billing documents and no way to know which government program was being billed for each patient at the time of each alleged incident of fraud.   *See Emery*, 134 F.3d at 1323 (plaintiffs not required to allege facts they could not acquire without discovery); *Lusby*, 570 F.3d at 854 (plaintiffs not required to provide invoices at the pleadings stage); *Pirelli*, 631 F.3d at 444 (noting in dicta that a "*qui tam* relator surely lacked access to reimbursement data from third-party payors that would have allowed him to provide additional circumstances corroborating the existence of fraud").

Finally, contrary to Defendants' argument, Defendants and the court are not "left to ponder who was actually billed, how the billing occurred, who submitted the bills, and

what was actually included on any such bills." (Defs.' Reply at 5.) Relators allege that billing was handled by Alina Sanchez, that Medicare billings were submitted every two weeks, that Ms. Sanchez answered to Ms. Wickman and Mrs. Ponakala, and that Ms. Wickman and Mrs. Ponakala instructed staff to provide false documentation to Sanchez in support of billings. (Compl. ¶¶ 44, 50.) Relators allege that billing submitted to the government included payment claims for patients not eligible for hospice care, *per diem* billing for absent patients, and continuous-care billing for care not predominantly provided by a nurse. The court finds that Relators' Complaint makes the alleged fraud in the billing process sufficiently clear to allow Defendants to respond to the allegations. Defendants' motion to dismiss Counts I and III is denied.

**B. Federal and State Retaliation Claims (Counts II and IV)**

    1. FCA Retaliation Claim

Relators allege that they were fired because they raised concerns to Mrs. Ponakala and Ms. Wickman about Generations's fraudulent practices, including the fact that patients were improperly certified as terminally ill. Relators claim that they were discharged in violation of the FCA's protections against retaliation in employment, pursuant to 31 U.S.C. §§ 3730(h)(1) and (2), which state:

> Any employee who is discharged . . . because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h). To state an FCA retaliatory discharge claim, Relators must allege that (1) their "actions were taken 'in furtherance of' an FCA enforcement action and were therefore protected by the statute;" (2) their employer knew they were engaged in this

protected conduct; and (3) their "discharge was motivated, at least in part, by the protected conduct." *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 479 (7th Cir. 2004).

Defendants argue that Relators fail to allege that they engaged in protected activity during their employment, as they simply raised concerns privately with Generations. Seventh Circuit case law is not entirely clear as to when such internal complaints can constitute protected conduct. In a 2002 case, the Seventh Circuit held that a plaintiff who expressed concern about billing practices and contacted Medicare for information about billing rules did not engage in protected conduct because his actions did not put his employer on notice of a possible *qui tam* action. *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002); *see also United States ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996) (plaintiff's conduct in advising her superiors of non-compliance with Medicaid program requirements did not suggest to employer that she intended to bring an FCA action.); *c.f. DeCalonne v. G.I. Consultants, Inc.*, 197 F. Supp. 2d 1126, 1135 (N.D. Ind. 2002) (denying summary judgment for defendant on FCA retaliation claim where plaintiff contacted defendant's legal counsel, raised issues at a board meeting, characterized defendant's conduct as illegal, and sought the advice of an outside attorney). Subsequently, however, the Seventh Circuit has indicated that at least some "type of internal complaints [may be] protected by the FCA." *Fanslow*, 384 F.3d at 482-83. The *Fanslow* court explained that "the relevant inquiry to determine whether an employee's actions are protected under § 3730(h) is whether: '(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Id.* at 480.

Here, Relators do not specifically allege that they raised their concerns in preparation for or in furtherance of an FCA action. But the Seventh Circuit has explained that an employee "need not have actual knowledge of the FCA for her actions to be considered 'protected activity.'" *Id.* at 479. Relators did raise concerns to their supervisors about improper certification of patients for hospice eligibility, and they explain why they believed the certifications were fraudulent. For the purposes of a motion to dismiss, the court finds that they have sufficiently alleged that they believed in good faith, and that a reasonable employee in similar circumstances would have believed, that Generations was defrauding the government.

The protected conduct must also put the employer "on notice of the distinct possibility of a qui tam action." *Id.* at 483. Regarding the notice requirement, *Fanslow* states that an employee who is not normally engaged in reporting fraudulent activity as part of his job duties is "not required to use any magic words" to put an employer on notice; the employee can meet the notice requirement if his employer is aware of his concerns about the legality of the employer's conduct. *Id*. at 484-85. Here, the court finds that Relators have sufficiently alleged that they made Generations aware of their concerns about the certification process.

Finally, Relators have sufficiently alleged that their "discharge was motivated, at least in part, by the protected conduct." *Id.* at 479. They allege that they were terminated "suddenly" after raising concerns, that they had spotless performance evaluations prior to their termination, and that Generations's proffered reasons for their termination were pretextual. They also allege that other employees were terminated for raising similar concerns. Viewing these allegations in the light most favorable to the Relators, they have

alleged sufficient circumstantial evidence that their protected conduct was a motivating factor in their discharge. *See id.* at 485-86 (emphasizing plaintiff's positive evaluations and the brief interval between notice of protected activity and termination in denying summary judgment for defendants). Defendants' motion to dismiss Count II is denied.

2. IWRPA Retaliation Claim

Relators claim a violation of 740 Ill. Comp. Stat. 174/30. This section of the IWRPA allows an employee to bring a civil action for violations of 740 Ill. Comp. Stat. 174/15 and 20. Section 15 provides that

> (a) An employer may not retaliate against an employee who discloses information in a court, an administrative hearing, or before a legislative commission or committee, or in any other proceeding, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.
>
> (b) An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation.

740 Ill. Comp. Stat. 174/15. Section 20 provides that

> An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation, including, but not limited to, violations of the Freedom of Information Act.

740 Ill. Comp. Stat. 174/20.

Relators acknowledge that they did not disclose any violation or information in a proceeding or to "a government or law enforcement agency," as required by 174/15. Although Relators do not explain whether they can proceed on a claim pursuant to 174/20, the court notes that Relators have not cited evidence showing that they refused to participate in activities that violated federal regulations. *See Robinson v. Alter Barge*

*Line, Inc*., 513 F.3d 668, 670 (7th Cir. 2008) (plaintiff had no claim under IWRPA after reporting co-workers' drug use because there was "no indication that he refused to use drugs himself"); *Perez v. Bd. of Educ.*, No. 09 C 2095, 2010 WL 3167295, at *7-8 (N.D. Ill. Aug. 10, 2010) (teacher had no IWRPA claim because she did not refuse to follow school policy to avoid violating the law). The court therefore dismisses Relators' IWRPA claim without prejudice. Relators ask in their Response brief for the court's leave to amend their Complaint to add new state-law retaliation claims, and the court will allow them leave to do so.

## C. Defendant Narayan Ponakala

Defendants argue that Relators have not stated a claim against Narayan Ponakala. According to Defendants, the allegations in the complaint are limited to the facts that Mr. Ponakala founded Generations in 2002, received money from Generations, and bought a house. These allegations have no bearing on the state and federal fraud claims. The court agrees that the Complaint fails to state a claim against Mr. Ponakala, and the claims against him are dismissed without prejudice. Relators ask for leave to amend their complaint to "add significant details" about Mr. Ponakala's involvement in fraudulent billing and retaliation; they are granted leave to do so.

## D. Odyssey's Motion to Dismiss

Odyssey moves to dismiss the claims against it because Relators' allegations fail to allege fraud with the specificity required by Rule 9(b) and because there is no nexus between the allegations and claims submitted to the government. For these grounds of its motion, Odyssey relies on the arguments made by the other Defendants as to whether

Relators' allegations sufficiently allege fraud and claims submitted to the government for payment. The court has addressed these arguments above and need not do so again.

In addition, Odyssey argues that the fraudulent and retaliatory acts alleged by Relators are unrelated to Odyssey and cannot form the basis for a claim against Odyssey. The Complaint contains few allegations that are specific to Odyssey. It alleges that Odyssey purchased Generations on or about December 31, 2009, and incorporated Generations "into its existing structure," hiring all of Generations's employees and putting all of Generations's patients on its own patient census. (Compl. ¶ 22.) Generations became Odyssey's new "Southwest Office," scheduled to merge with its existing "South Office." (*Id.*) Relators further allege that Odyssey was aware of Generations's fraudulent practices. In late October or early November 2009, Janus told Odyssey's Regional Vice President for Sales, Gary Johnson, that Generations was "dirty." He later told the Relators in January 2010 that Odyssey knew "it's a mess over there" but that the problems would be taken care of. (*Id.* at ¶ 23.)

The court agrees with Odyssey that these allegations do not suggest that Odyssey was itself responsible for the submission of false claims to the government or was involved in Relators' termination. The allegation that Odyssey was "aware" of "dirty" practices does not allege a violation of the FCA or the Illinois False Claims Act. Relators, however, argue that "the sale of Generations to Odyssey is dispositive of Odyssey's liability" (Resp. in Opp. to Odyssey's Mot. to Dismiss 2, ECF. No. 48.) because Odyssey is liable as Generations's successor.

Successor liability is an equitable doctrine that "provides an exception from the general rule that a purchaser of assets does not acquire a seller's liabilities." *Chi. Truck*

*Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995); *EEOC v. G-K-G, Inc.*, 39 F.3d 740 (7th Cir. 1994). Successor liability applies to FCA cases. *See, e.g.*, *U.S. ex rel. Jajdelski v. Kaplan, Inc.*, 834 F. Supp. 2d 1182 (D. Nev. 2011). The theory "allows lawsuits against even a genuinely distinct purchaser of a business if (1) the successor had notice of the claim before the acquisition; and (2) there was substantial continuity in the operation of the business before and after the sale." *Chi. Truck Drivers*, 59 F.3d at 49. Thus, to proceed with a claim based on successor liability, Relators must allege that Odyssey had notice of the claims against Generations before its acquisition of Generations on December 31, 2009, and that there was "substantial continuity" in the operation of the business.

The court finds that, viewing the facts in the light most favorable to Relators, Relators have sufficiently alleged that Odyssey had notice of their claims against Generations. Relators' claim was not made public until December 1, 2011, a year after the purchase. Janus, however, worked for Odyssey at the time of its purchase of Generations, and Relators allege that Janus had a conversation with one of Odyssey's officers, Gary Johnson, about problems at Generations. Janus said that she thought Generations was "dirty," although she does not allege that she told Johnson that there was any pending litigation or that Generations was engaged in a specific fraudulent scheme. Shortly after the purchase, Johnson acknowledged to Relators that Odyssey knew there were problems with Generations. These communications in themselves might not suffice to establish notice, but the court also considers the fact that the entire staff of Generations, including its management, was employed by Odyssey. The continuance of staff in management positions further supports the inference that Odyssey or its principals

had actual notice of Generations's potential liability. *See U.S. ex rel. Fisher v. Network Software Assocs., Inc.*, 180 F. Supp. 2d 192, 196 (D.D.C. 2002) (finding notice where the same person was in control of both the predecessor and successor entities).

Relators have also sufficiently alleged continuity of operations to survive a motion to dismiss. All of Generations's employees and patients were incorporated into Odyssey's existing structure after the sale; the new company provided the same services as the old, and its office remained at the same location. *See Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1329 (7th Cir. 1990) (continuity of business operations was established where two companies had the same management and work force, used the same location and equipment, manufactured the same products, and serviced the same customers). The court therefore finds that Relators have sufficiently alleged successor liability to survive a motion to dismiss.

## IV. CONCLUSION

The court denies Generations's and Odyssey's motions to dismiss as to Counts I-III of the Complaint and dismisses Count IV without prejudice. The court also dismisses Relators' claims against Narayan Ponakala without prejudice. Relators are granted leave to file an amended complaint within 28 days.

ENTER:

_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED: August 14, 2012